Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                            Docket No.: _____(      )

                              Plaintiffs,

          -against-


FAMILY RX CORP., MIKHAIL KUSHMAKOV, QUICK
HEALTH PHARMACY CORP., ILIA BOROKHOV, NY
UNION PHARMACY INC., OLGA NIAZOV, AND
JOHN DOE NOS. "1" THROUGH "5",

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Family Rx Corp. ("Family Rx"),

Mikhail Kushmakov ("Kushmakov"), Quick Health Pharmacy Corp. ("Quick Health"), Ilia

Borokhov ("Borokhov"), NY Union Pharmacy Inc. ("NY Union"), Olga Niazov ("Niazov"), and

John Doe Nos. "1" through "5" (the "John Doe Defendants") (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a large, on-going fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3.7 million in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges seeking payment for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, primarily in the form of Lidocaine 5% Ointment, Lidocaine 5% Patches, and Diclofenac Gel 3% (collectively, the "Fraudulent Topical Pain Products), as well as various other medications including oral non-steroidal anti-inflammatory drugs and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      The Defendants' scheme involved three pharmacies – Family Rx, Quick Health and NY Union – which were used to submit millions in billing to GEICO for the Fraudulent Pharmaceuticals purportedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). Although the Defendants presented Family Rx, Quick Health and NY Union (collectively, the "Pharmacies") as neighborhood pharmacies that were separately owned, Kushmakov in fact owned Family Rx, and secretly owned and controlled Quick Health and NY Union with Borokhov and Niazov, respectively. The Defendants executed their complex fraudulent scheme through multiple pharmacies in order to reduce the volume of fraudulent pharmaceutical billing submitted under any single name or tax identification number, avoid detection, and thereby perpetuate their scheme and increase their ill-gotten gains.

3.      To exploit the patients for financial gain, the Defendants intentionally targeted the prescription and dispensing of the Fraudulent Topical Pain Products, in place of other effective, but much-less costly drug products because the Defendants could bill for the topical products at exorbitant prices.  The Defendants thereafter entered into illegal, collusive agreements with various prescribing healthcare providers (collectively, the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics") and steered the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to the Pharmacies, without regard to genuine patient care.

4.      The Defendants, in exchange for paying kickbacks or providing other financial incentives, received thousands of medically unnecessary, duplicitous prescriptions from the Prescribing Providers and Clinic Controllers pursuant to fraudulent predetermined protocols. In many instances, these prescriptions were generated using illegal pre-printed "checklist-type" prescription order forms (the "Fraudulent Prescription Forms") created by the Defendants and/or Clinic Controllers and distributed to the Prescribing Providers.

5.      The scheme by the Defendants to steer the Prescribing Providers and Clinic Controllers to routinely prescribe large volumes of specifically targeted Fraudulent Pharmaceuticals to Insureds and route those prescriptions to the Pharmacies egregiously inflated the charges submitted to GEICO.  For example, Family Rx typically billed GEICO between $1,523.08 and $1,904.65 for a single tube of Lidocaine 5% Ointment; and between $2,359.00 and $2,948.75 for a single tube of Diclofenac Gel 3%.  Likewise, Quick Health typically billed GEICO between $1,220.00 and $1,530.00 for a single tube of Lidocaine 5% Ointment; and between

$224.70 and $454.40 for Lidocaine 5% Patches. Further, NY Union typically billed GEICO between $1,523.08 and $1,904.65 for a single tube of Lidocaine 5% Ointment.

6.      By this action, GEICO seeks to recover more than $594,500.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of over $2.4 million in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through the Pharmacies because:

(i)      the Defendants billed for Fraudulent Pharmaceuticals which were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants exploited the No-fault pharmacy reimbursement schedule by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

(iv)     the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health and NY Union with the New York State Education Department Board of Pharmacy (the "NYS Pharmacy Board") in order to illegally conceal the identities of all of the true owners and controllers of Quick Health and NY Union in violation of law; and

(v)      the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, duplicitous, and/or forged prescriptions.

7.      The Defendants fall into the following categories:

(i)   The Pharmacies – Family Rx, Quick Health and NY Union – are New York corporations that engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which they are not entitled;

(ii)   Kushmakov is the record owner of Family Rx;

(iii)   Borokhov is the record owner of Quick Health;

(iv)   Niazov is the record owner of NY Union; and

(v)   John Doe Nos. "1" through "5" are persons and entities, presently not identifiable, who along with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

8.   The Defendants' scheme began in 2019. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Defendants made false statements on documents filed on behalf of Quick Health and NY Union in order to illegally conceal the identities of all of the true owners and controllers of Quick Health and NY Union in violation of law; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, duplicitous, and/or forged prescriptions.

9.      Based on the foregoing, the Pharmacies do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.

10.     The charts attached hereto as Exhibit "1" – "3" set forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through the Pharmacies using the United States mail.

11.     As a result of the Defendants' scheme, GEICO has incurred damages of approximately $594,500.00.

## THE PARTIES

### I.      Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

13.     Defendant Family Rx is a New York corporation, incorporated on or about June 19, 2019, with its principal place of business at 69-29 Myrtle Avenue, Glendale, New York.

14.     Defendant Quick Health is a New York corporation, incorporated on or about June 25, 2019, with its principal place of business at 104-12 Metropolitan Avenue, Forest Hills, New York.

15.     Defendant NY Union is a New York corporation, incorporated on or about January 6, 2020, with its principal place of business at 161-02 Union Turnpike, Fresh Meadow, New York.

16.     Defendant Kushmakov resides in and is a citizen of New York, and is the record owner of Family Rx.

17.     Defendant Borokhov resides in and is a citizen of New York, and is the record owner of Quick Health.

18.     Defendant Niazov resides in and is a citizen of New York, and is the record owner of NY Union.

19.     The Defendants knowingly submitted fraudulent claims to GEICO for pharmaceuticals dispensed to GEICO Insureds and continue to seek reimbursement on unpaid fraudulent claims.

20.     John Doe Nos. "1" through "5" are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, and who, upon information and belief, reside in and are citizens of New York.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.      **An Overview of New York's No-Fault Laws**

25.     GEICO underwrites automobile insurance in the State of New York.

26.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165 et seq.)(collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

28.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

29.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician

or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

30.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

32.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

33.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.    **An Overview of Applicable Licensing Laws**

34.    Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

35.    Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

36.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

37.    Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

38.    New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

39.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

40.     New York Education Law § 6512, § 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

41.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

42.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

43.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

44.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

45.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

46.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

III.    **The Defendants' Scheme Involving The Fraudulent Pharmaceuticals**

A.      **Overview of the Scheme**

47.     Beginning in 2019, and continuing uninterrupted through the present day, the Defendants implemented a fraudulent scheme in which they used the Pharmacies to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for Fraudulent Pharmaceuticals purportedly dispensed to Insureds.

48.     Family Rx, Quick Health and NY Union purported to be separate, storefront neighborhood pharmacies operating in Queens, New York, but instead operated as a single large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

49.     In December of 2019, Kushmakov began to submit fraudulent billing to GEICO through Family Rx, a pharmacy located at 69-29 Myrtle Avenue, Glendale, New York.

50.     Kushmakov, not content with submitting fraudulent billing through Family Rx, secretly spearheaded the creation and operation of two additional pharmacies – Quick Health and NY Union – to increase the volume of fraudulent billing and to disperse it through different corporate entities to conceal the fraudulent pharmacy scheme.

51.     In January of 2020, merely one month after Family Rx commenced its operation, the Defendants began to simultaneously submit billing to GEICO through Quick Health, which is located only about two miles from Family Rx.

52.     Thereafter, in September of 2021, NY Union commenced its operation, and the Defendants also began to submit billing to GEICO through a third pharmacy, namely, NY Union, which is located less than two and half miles from Quick Health.

53.     Although Borokhov is the purported sole owner and operator of Quick Health, at all relevant times Kushmakov secretly participated in the ownership and control of Quick Health.

54.     Borokhov did not own or operate any other pharmacy prior to becoming the record owner and operator of Quick Health.

55.     Borokhov had no prior work experience with a pharmacy or with prescription drug products and did no research into the pharmacy business prior to purportedly forming Quick Health.  In fact, Borokhov was unaware of the steps necessary to set up and register a pharmacy in New York State and was unfamiliar with the New York State Education Department, which handles the application and registration of pharmacies in New York State.

56.     Despite having no prior experience or knowledge, Borokhov claimed that he formed Quick Health because he heard it was a "good business" from individuals whose name or background he did not know.

57.     Borokhov's role with respect to Quick Health at all times has been limited to delivering pharmaceuticals to patients, and in fact, his primary job has been working full-time as a home attendant.

58.     In keeping with the fact that Kushmakov secretly participates in the ownership and control of Quick Health, Borokhov has little, if any, knowledge regarding crucial aspects of Quick

Health's operations, including, among other things: (i) whether Quick Health has any written policies and/or procedures in place; (ii) the major sources of prescriptions steered to Quick Health; (iii) the documents submitted to insurers in support of Quick Health's billing; and (iv) Quick Health's relationship with various entities that received substantial monies from the pharmacy.

59.     In accordance with their fraudulent scheme, the Defendants mispresented the identity of the true owner and controller of Quick Health by (i) falsely identifying Borokhov as the only owner and controller in violation of law and (ii) concealing Kushmakov's interest, ownership, and control in Quick Health.

60.     To conceal his identity and involvement, Kushmakov used a series of shell companies to secretly participate in the ownership and control of Quick Health.

61.     Despite Borokhov claiming to have no knowledge of Kushmakov, Quick Health paid over $800,000.00 to various companies owned by and/or associated with Kushmakov.  Family Rx also made substantial payments to the same Kushmakov owned and/or associated companies.

62.     Moreover, at all relevant times, Kushmakov also secretly participated in the ownership and control of NY Union despite the fact that Niazov is the sole record owner and operator of NY Union.

63.     In fact, Niazov's role with respect to NY Union's operation is minimal. Niazov's presence at the pharmacy is limited to one day per week and involves minor tasks, such as ensuring that expenses, such as utilities and rent are paid.  Niazov does not even review the bills submitted by NY Union prior to them being submitted to insurers.

64.     Notably, certain individuals employed by Kushmakov at Family Rx also work at NY Union.  For example, Merhay Yagudayev is employed by Kushmakov as Family Rx's manager

while also serving as NY Union's manger.  Sarfraz H. Subzwari serves as Family Rx's supervising pharmacist while also working as a pharmacist at NY Union.

65.     Despite purporting to be a legitimate operating pharmacy, NY Union's pharmacists did not maintain a regular and/or full-time schedule at the pharmacy.  In fact, NY Union oftentimes had no pharmacist present at the pharmacy during its business hours of operation. Yet, pursuant to illegal, collusive agreements, Prescribing Providers and Clinic Controllers continued to steer prescriptions to NY Union, including No-Fault clinics owned and/or controlled by Kushmakov.

66.     Kushmakov, in association with Borokhov, Niazov and the John Doe Defendants, formed Quick Health and NY Union for the purpose of further inflating the fraudulent pharmaceutical billing submitted to GEICO and other insurers for the targeted Fraudulent Topical Pain Products.

67.     To conceal the fact that Family Rx, Quick Health and NY Union operated as a single, large scale fraudulent scheme, specific No-Fault Clinics and Prescribing Providers steered voluminous amounts of medically unnecessary prescriptions for the Fraudulent Pharmaceuticals to each of the Pharmacies.

68.     Nonetheless, the Defendants' fraudulent scheme involving Family Rx, Quick Health and NY Union was centered around the prescription and dispensing of a limited set of exorbitantly priced pharmaceutical products.

69.     Specifically, unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Family Rx, Quick Health and NY Union's business was overwhelmingly focused on the same set of Fraudulent Topical Pain Products.

70.     The Defendants have submitted – to GEICO alone – over $3.3 million in claims for reimbursement of the Fraudulent Topical Pain Products, which account for nearly 89% of the billing submitted through the Pharmacies.

71.     In keeping with the fact that that the Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, the Pharmacies overwhelmingly dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, and Diclofenac Gel 3%.

72.     Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which noted that Lidocaine and Diclofenac have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See, Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

73.     The Defendants chose the Lidocaine and Diclofenac products because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves.  Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Defendants to target the prescription of Lidocaine 5% Ointment, Lidocaine 5% Patches, and Diclofenac Gel 3% despite the lack of medical necessity for these particular products.

74.     The remaining billing submitted through the Pharmacies was primarily for oral pain-relieving medications, including nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to defraud GEICO.

75.     In furtherance of the fraudulent scheme, the Defendants entered into complex financial arrangements with one another and others, including Prescribing Providers and Clinic

16

Controllers at No-Fault Clinics, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks or other financial incentives for large volumes of prescriptions for specifically targeted Fraudulent Topical Pain Products.

76.     Among other things, the Defendants paid unlawful kickbacks to Clinic Controllers at No-Fault Clinics, and, in exchange, the Prescribing Providers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific Fraudulent Topical Pain Products with exorbitant profit margins and routed those prescriptions to the Pharmacies.

77.     Among other things, the Pharmacies paid kickbacks to Clinic Controllers at No-Fault Clinics who concealed themselves as mere landlords in order to avoid detection of the Defendants' illegal scheme.

78.     In fact, Kushmakov not only owns Family Rx and secretly participates in the ownership of Quick Health and NY Union, but he also controls at least two No-Fault Clinics which were the main source of prescriptions steered to the Defendants through Family Rx and NY Union.

79.     Specifically, Kushmakov is the leaseholder at the No-Fault Clinics located at 92-08 Jamaica Ave, Woodhaven, New York (the "Woodhaven Clinic") and 97-01 101 Avenue, Ozone Park, New York ("Ozone Park Clinic") (collectively, the "Kushmakov Clinics").

80.     Notably, the Kushmakov Clinics have been the source of forged and/or altered prescriptions that were subsequently used to bill GEICO for pharmaceuticals purportedly dispensed to GEICO Insureds.

81.     Specifically, during a deposition in the federal action captioned, GEICO v. Custom RX Pharmacy, LLC, et al., 20-cv-02622 (CBA) (SJB) (E.D.N.Y. 06/12/2020) (the "Custom RX litigation"), Radha Gara, M.D. ("Dr. Gara") testified that while operating at the Kushmakov Clinics, he identified several prescriptions issued in his name that were forged and/or altered to

include additional pharmaceuticals that he did not prescribe to GEICO Insureds. Dr. Gara further testified that the front desk employees at the Kushmakov Clinics were responsible for directing prescriptions to pharmacies. The forged and/or altered prescriptions identified by Dr. Gara were issued using pre-printed prescription order forms (i.e., Fraudulent Prescription Forms) which were thereafter submitted to GEICO in support of the pharmacy's fraudulent billing.

82. Not surprisingly, the Kushmakov Clinics steered prescriptions for the Fraudulent Pharmaceuticals to Family Rx that appear to have been forged or altered and thereafter, submitted to GEICO in support of Family Rx's fraudulent billing.

83. Specifically, Family Rx regularly received large volumes of prescriptions from Joseph Raia, M.D., P.C. ("Raia MD PC)", which operated at the Kushmakov Clinics. At times, the Fraudulent Prescription Forms issued by medical practitioners associated with Raia MD PC, including Eric Kenworthy, M.D. ("Dr. Kenworthy") and Olga Gibbons, M.D. ("Dr. Gibbons) were altered to include Fraudulent Topical Pain Products that were not included on the original prescription submitted to GEICO by the Prescribing Providers with their claim for reimbursement of the corresponding medical examination. For example:

- On October 31, 2020, Insured D.T. was allegedly involved in a motor vehicle accident. Thereafter, D.T. sought treatment with Raia MD PC at the Woodhaven Clinic. On November 12, 2020, D.T. underwent an initial examination with Dr. Kenworthy who issued a prescription for Naproxen and Flexeril using a Fraudulent Prescription Form dated November 12, 2020. On or about November 25, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) and Lidocaine 5% Ointment dispensed to D.T. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on November 12, 2020. Notably, the prescription Family Rx submitted to GEICO was altered from the original prescription submitted by Raia MD PC to include Lidocaine 5% Ointment. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "4".

- On October 31, 2020, Insured S.T. was allegedly involved in a motor vehicle accident. Thereafter, S.T. sought treatment with Raia MD PC at the Woodhaven Clinic. On November 12, 2020, S.T. underwent an initial examination with Dr. Kenworthy who issued a prescription for Naproxen and Flexeril using a Fraudulent Prescription Form

dated November 12, 2020. On or about November 25, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) <u>and</u> Lidocaine 5% Ointment dispensed to S.T. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on November 12, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment with two refills. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "5".

- On October 17, 2020, Insured S.P. was allegedly involved in a motor vehicle accident. Thereafter, S.P. sought treatment with Raia MD PC at the Woodhaven Clinic. On November 12, 2020, S.P. underwent an initial examination with Dr. Kenworthy who issued a prescription for Naproxen and Flexeril using a Fraudulent Prescription Form dated November 12, 2020. On or about November 25, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) <u>and</u> Lidocaine 5% Ointment dispensed to S.P. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on November 12, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment with two refills. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "6".

- On October 17, 2020, Insured H.V. was allegedly involved in a motor vehicle accident. Thereafter, H.V. sought treatment with Raia MD PC at the Woodhaven Clinic. On November 12, 2020, H.V. underwent an initial examination with Dr. Kenworthy who issued a prescription for Naproxen and Flexeril using a Fraudulent Prescription Form dated November 12, 2020. On or about November 25, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) <u>and</u> Lidocaine 5% Ointment dispensed to H.V. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on November 12, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "7".

- On April 17, 2020, Insured J.I. was allegedly involved in a motor vehicle accident. Thereafter, J.I. sought treatment with Raia MD PC at the Woodhaven Clinic. On April 22, 2020, J.I. underwent an initial examination with Dr. Kenworthy who issued a prescription for Naproxen and Flexeril using a Fraudulent Prescription Form dated April 22, 2020. On or about May 5, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) <u>and</u> Lidocaine 5% Ointment dispensed to J.I. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on April 22, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "8".

- On October 31, 2020, Insured R.M. was allegedly involved in a motor vehicle accident. Thereafter, R.M. sought treatment with Raia MD PC at the Woodhaven Clinic. On

November 12, 2020, Insured R.M. underwent an initial examination with Dr. Kenworthy who issued prescriptions for Naproxen and Flexeril. On or about November 25, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Naproxen, Cyclobenzaprine (Flexeril) <u>and</u> Lidocaine 5% Ointment dispensed to R.M. pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on November 12, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment with two refills. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "9".

- On August 11, 2020, Insured B.B. was allegedly involved in a motor vehicle accident. Thereafter, B.B. sought treatment with Raia MD PC at the Ozone Park Clinic. On September 2, 2020, B.B. underwent an initial examination with Dr. Gibbons who issued prescriptions for Diclofenac Gel 3%, Flexeril and Ibuprofen. On or about September 10, 2020, Family Rx submitted bills to GEICO seeking reimbursement for Diclofenac Gel 3%, Cyclobenzaprine (Flexeril), Ibuprofen, <u>and</u> Lidocaine 5% Ointment dispensed to B.B. pursuant a Fraudulent Prescription Form purportedly issued by Dr. Gibbons on September 2, 2020. Notably, the prescription Family Rx submitted to GEICO was <u>altered from the original prescription</u> submitted by Raia MD PC to include Lidocaine 5% Ointment with two refills. Copies of the original and altered prescriptions discussed herein are attached as Exhibit "10".

84.     Moreover, the Kushmakov Clinics and the Prescribing Providers that operate therefrom have been the subject of previous investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

85.     For example, Joseph A. Raia, M.D. ("Dr. Raia") – the record owner of Raia MD PC – has a substantial history of healthcare fraud schemes. In March 2014, Dr. Raia agreed to pay a $1.5 million penalty and enter into a 15-year exclusion from participating in all Federal health care programs to settle a civil monetary penalty case with the Office of Inspector General (the "OIG") for the U.S. Department of Health and Human Services. The OIG alleged, in part, that Dr. Raia submitted, or caused to be submitted "thousands of claims for physical therapy and related physical medicine and rehabilitation services to Medicare for services that were never provided or were otherwise false or fraudulent". <u>See</u> HHS OIG Media Communications March 12, 2014 News

Release. Dr. Raia was also a named defendant in federal actions involving fraudulent services billed to No-Fault insurers, including <u>GEICO v. Badia, M.D. et al.</u>, Docket No. 1:13-cv-01720 (CBA)(VMS) (E.D.N.Y. 3/29/2013) and <u>GEICO v. Prescott, M.D. et al.</u>, Docket No. 1:14-cv-00057 (BMC) (E.D.N.Y. 1/6/2014).

86.     Dr. Kenworthy, who is associated with Raia MD PC and purportedly issued prescriptions filled by Family Rx, also has a history of involvement in healthcare fraud schemes. Dr. Kenworthy was a named defendant in a recent federal litigation captioned, <u>GEICO v. Kenworthy et al.</u>, Docket No. 1:22-cv-03728 (LDH)(SJB) (E.D.N.Y. 6/23/2022), wherein it was alleged that, among other things, Dr. Kenworthy agreed to front as the "owner" of medical practices that were in fact owned and controlled by unlicensed laypersons and used to submit more than $1 million in fraudulent billing to GEICO.

87.     In keeping with the fact that the prescriptions for the Fraudulent Pharmaceuticals were issued and steered to the Pharmacies pursuant to illegal, collusive arrangements and kickback schemes, many prescriptions purportedly issued by Dr. Kenworthy, Dr. Gibbons, and Nadine Yamout, P.A. ("Yamout"), and submitted in support in support of Family Rx and/or NY Union's claims for reimbursement, were issued using Fraudulent Prescription Forms similar to those identified by Dr. Gara in the Custom RX litigation as being forged and/or altered while operating at the Kushmakov Clinics.

88.     In further keeping with the fact that the Defendants entered into illegal, collusive agreements and participated in kickback schemes, Family Rx, Quick Health and NY Union received prescriptions from No-Fault Clinics that were identified in a federal criminal indictment involving a wide-ranging scheme being run by Nathaniel Coles (an unlicensed layperson) who

paid kickbacks in exchange for patient contact information so that they could steer those patients to treat at certain clinics.  See USA v. Rose, 19-cr-00789 (PGG).

89.     The Government affidavits unsealed in USA v. Rose include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to the following layperson-controlled No-Fault Clinic locations which steered prescriptions to Family Rx, Quick Health and/or NY Union: (i) 105-10 Flatlands Ave, Brooklyn; (ii) 1767 Southern Blvd., Bronx; and (iii) 145 East 98th Street, Brooklyn.

90.     For example, Quick Health received prescriptions from Hyeong Lim, FNP ("Lim"), Youn Ju Lee, FNP ("Lee") and Michael Alleyne, M.D. ("Dr. Alleyne") – practitioners associated with Metro Pain Specialists, P.C. ("Metro Pain").  Metro Pain operated at 105-10 Flatlands Ave, Brooklyn – the No-Fault Clinic from where Lim, Lee and Dr. Alleyne issued prescriptions that were dispensed and billed through Quick Health.

91.     The use of Lim, Lee and Dr. Alleyne's names and their association with Metro Pain further raises serious concerns regarding the validity and medical necessity of the prescriptions dispensed by Quick Health.  In fact, affidavits obtained in other federal actions from Metro Pain employees – including Lim and Dr. Alleyne – revealed that (i) prescribers were required to issue prescriptions for topical pain products as a condition of employment; (ii) prescribers were asked to sign blank pre-printed prescription forms that were thereafter filled out by clinic staff; (iii) photocopied and/or stamped signatures were used without the prescribers' knowledge or consent; and/or (iv) prescriptions were forged and/or fraudulently altered to include additional pharmaceuticals.

92.     Metro Pain itself has been a named defendant in multiple federal cases involving fraudulent billing submitted to No-Fault insurers.  See State Farm Mut. Ins. Co. v. Metro Pain

Specialists, P.C., et al., Docket No. 21-cv-05523 (MKB)(PK) (E.D.N.Y. 10/5/2021); Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., Docket No. 21-cv-05586 (DG)(RER) (E.D.N.Y. 10/7/2021).  Metro Pain also operated from at least five No-Fault clinics connected to Peter Khaim who was indicted for perpetrating a multimillion-dollar pharmacy fraud scheme.  See USA v. Peter Khaim, et al., 1:20-CR-00580 (AMD)(RML).

93.     Further, some prescriptions dispensed by and billed through Family Rx were issued by a nurse practitioner, Phelan Clancy, NP. ("Clancy") working at a No-Fault Clinic located at 1975 Linden Boulevard, Elmont (the "Linden Clinic").  Clancy has stated under oath that she resigned from the Linden Clinic after discovering that her name, license, and tax identification number were being used to bill for services that she never performed, authorized, or supervised; that she was constantly put under pressure to prescribe medications regardless of whether the patient's condition warranted the prescription or referral; that the clinic manager named "Danny" told her about the need to prescribe Lidocaine 5% Ointment to every patient; that "Danny" (not the patient) chose which pharmacy was sent the prescriptions; that there was a written list on the wall outlining the prescribing/referral protocol and the quotas that had to be met; and that she followed the prescribing protocols because she needed to keep working at the clinic due to her poor financial situation.

94.     Quick Health also received prescriptions from Jean-Pierre Barakat, M.D. ("Dr. Barakat") who has been a named defendant in several affirmative fraud actions including, GEICO v. Direct Rx, Inc. et al., Docket No. 1:19-cv-05876 (DG)(LB), Allstate Ins. Co. et al. v. New Century Pharmacy Inc. et al., Docket No. 1:19-cv-05702-ENV-VMS, and GEICO v. Barakat, M.D. et al., Docket No. 1:17-cv-01066 (NGG)(LB).

95.     Plainly, the prescriptions for the Fraudulent Pharmaceuticals dispensed by Family Rx, Quick Health and NY Union were either forged, altered or issued in protocol fashion, without regard for genuine patient care, and steered to Family Rx, Quick Health and NY Union pursuant to illegal, collusive agreements between the Defendants, the Prescribing Providers and Clinic Controllers.

96.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and Clinic Controllers at the No-Fault Clinics to provide the Pharmacies with prescriptions pursuant to predetermined protocol and illegal collusive arrangements, the Insureds were virtually never given the option to use a pharmacy of their choosing.

97.     The Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribing Providers' practices; and (ii) the fact that that there were countless other pharmacies located much closer to the Insureds' residences.

98.     Specifically, about 69% of the Insureds that allegedly received pharmaceuticals dispensed by Family Rx lived outside of Queens County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout Brooklyn, the Bronx, Manhattan and Long Island, including Nassau and Suffolk County.

99.     Likewise, about 71% of the Insureds that allegedly received pharmaceuticals dispensed by Quick Health lived outside of Queens County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout Brooklyn, the Bronx, Manhattan, and Long Island, including Nassau and Suffolk County.

100.     Similarly, many of the Insureds that allegedly received pharmaceuticals dispensed by NY Union lived outside of Queens County, New York, where the pharmacy is located.

101.     In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by Family Rx or Quick Health lived in cities and counties outside of New York City including Westchester County, Orange County, Dutchess County, and with some residences located outside of the State of New York such as New Jersey, Pennsylvania, and Connecticut. Upon information and belief , the same is true for many of the Insureds who received, or purportedly received, pharmaceuticals dispensed by NY Union.

102.     In most cases, the Pharmacies either purported to deliver or mail the Fraudulent Pharmaceuticals directly to Insureds' residences or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

103.     But for the Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

104.     Instead, the Prescribing Providers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies, irrespective of the Pharmacies' inconvenient location to the Insureds' residences or the Prescribing Providers' practices, because the prescriptions were being issued pursuant to illegal, collusive agreements.

105.     The Pharmacies, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to fraudulent predetermined protocols.

106.     The Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

107.    In many instances, the prescriptions received and filled by Family Rx and NY Union were issued on preprinted template prescription forms i.e., the Fraudulent Prescription Forms.

108.    The Fraudulent Prescription Forms contain pre-printed names of predetermined Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and the quantity in which they were to be prescribed and dispensed to Insureds.

109.    The Fraudulent Prescription Forms are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

110.    Nonetheless, the Defendants and/or Clinic Controllers created and distributed the Fraudulent Prescription Forms to Prescribing Providers in violation of law and to further facilitate the prescription of targeted Fraudulent Pharmaceuticals and the steering of those prescriptions to the Defendants.

111.    The Fraudulent Prescription Forms steered and ensured that the Prescribing Providers would prescribe predetermined Fraudulent Pharmaceuticals, which Family Rx and NY Union thereafter billed at exorbitant charges.

112.    A sample of the prescriptions purportedly issued by the Prescribing Providers using the Fraudulent Prescription Forms, which Family Rx and NY Union submitted to GEICO in support of its fraudulent billing, are annexed hereto as Exhibit "11".

113.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

114.     After having the prescriptions steered to the Pharmacies, the Defendants purportedly delivered the Fraudulent Pharmaceuticals directly to the Insureds' residence, or alternatively, delivered the Fraudulent Pharmaceuticals to the No-Fault Clinics.

115.     The Defendants implemented their pharmaceutical fraud scheme involving the Prescribing Providers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from the Pharmacies to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds through the Pharmacies with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

116.     The Prescribing Providers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

**B.     The Fraudulent Topical Pain Products Were Prescribed and Dispensed Without Regard to Genuine Patient Care**

117.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from

Family Rx, Quick Health, and NY Union – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

118.    Despite the basic goal to help patients get better in a timely manner, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

119.    Rather, the Prescribing Providers produced generic, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the No-Fault Clinic providers purport to render to Insureds. These healthcare services include the prescription of excessive amounts of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

120.    In fact, many of the Prescribing Providers' examination reports contain pre-printed treatment plan sections listing the predetermined and specifically targeted Fraudulent Pharmaceuticals that are routinely dispensed and billed through the Pharmacies.

121.    Notwithstanding the creation of the examination reports, the Prescribing Providers' prescription of the Fraudulent Pharmaceuticals dispensed by the Pharmacies was based on

predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

122.    To the extent that any examination was actually performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

123.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

124.     The Prescribing Providers also failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

125.    The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Family Rx, Quick Health or NY Union were actually used by the patient.

126.    The Prescribing Providers also failed to document in their follow-up examinations whether the Fraudulent Pharmaceuticals dispensed by Family Rx, Quick Health or NY Union provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

127.    In some instances, the Prescribing Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical.

128.    Nevertheless, the Prescriber Providers routinely prescribed voluminous Fraudulent Pharmaceuticals, including multiple Fraudulent Pharmaceuticals on the same date to a single patient.

129.    Notably, each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

130.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as an oral and topical NSAIDs (e.g., Ibuprofen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

131.    Despite the risks of therapeutic duplication, the Prescribers routinely prescribed, and the Defendants routinely dispensed multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient.

132.    Moreover, in keeping with the fact that the Defendants targeted a specific set of exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, the Prescribing Providers often issued prescriptions for the same set of Fraudulent Pharmaceuticals to Insureds involved in the same motor vehicle accident, regardless of the Insured's individual circumstances or actual injuries, and without regard to genuine patient care. For example:

- On June 16, 2022, two Insureds – X.E. and H.E.– were involved in the same motor vehicle accident. Thereafter, both X.E. and H.E. sought treatment with Jean Marie Gaetan, DNP-FNP ("Gaetan") at a No-Fault Clinic located at 82-17 Woodhaven Blvd., Glendale, New York. X.E. and H.E. were in different physical conditions and

experienced the impact from different positions in the vehicle. Nonetheless, Gaetan directed X.E. and H.E. to take the same set of Fraudulent Pharmaceuticals, namely, Cyclobenzaprine, Lidocaine 5% Ointment, and Naproxen. On August 19, 2022, Family Rx dispensed and billed for Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen pursuant to Fraudulent Prescription Forms purportedly issued by Gaetan to X.E. and H.E. on August 9, 2022.

- On October 12, 2020, two Insureds – N.A. and A.J. – were involved in the same motor vehicle accident. Thereafter, both N.A. and A.J. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. N.A. and A.J. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Lim directed N.A. and A.J. to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen. On October 20, 2020 and October 21, 2020, Quick Health dispensed and billed for Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen pursuant to prescriptions issued to N.A. and A.J. by Lim on October 20, 2020.

- On November 23, 2019, two Insureds – C.D. and E.D. – were involved in the same motor vehicle accident. Thereafter, both C.D. and E.D. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. C.D. and E.D. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Maria Rivera, M.D. ("Dr. Rivera") directed C.D. and E.D. to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Cyclobenzaprine. On January 7, 2020, Quick Health dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to prescriptions issued to C.D. and E.D. by Dr. Rivera on January 7, 2020.

- On December 4, 2020, two Insureds – S.B. and T.B. – were involved in the same motor vehicle accident. Thereafter, both S.B. and T.B. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. S.B. and T.B. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Lim directed S.B. and T.B. to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen. On December 23, 2020, Quick Health dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen pursuant to prescriptions issued to S.B. and T.B. by Lim on December 22, 2020.

- On November 24, 2020, two Insureds – E.S. and S.H. – were involved in the same motor vehicle accident. Thereafter, both E.S. and S.H. sought treatment with NYC Medical Treatment, P.C. ("NYC Medical") at a No-Fault Clinic located at 218-14 Hempstead Ave, 2nd Floor, Queens Village, New York. E.S. and S.H. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Michael Y. Jacobi, D.O. ("Dr. Jacobi") directed E.S. and S.H. to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Cyclobenzaprine. On December 2, 2020, and December 8, 2020, Quick Health

dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to prescriptions issued to E.S. and S.H. by Dr. Jacobi on November 30, 2020 and December 8, 2020, respectively.

- On October 11, 2021, two Insureds – E.L. and H.A. – were involved in the same motor vehicle accident. Thereafter, E.L. and H.A. sought treatment with Sagy Grinberg M.D. at a No-Fault Clinic located at 1767 Southern Blvd, Bronx, New York.  E.L. and H.A. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Su Jung Lee, N.P. ("Lee") directed E.L. and H.A. to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Naproxen. On October 25, 2021, NY Union dispensed and billed for Lidocaine 5% Ointment and Naproxen pursuant to Fraudulent Prescription Forms purportedly issued by Lee to E.L and H.A. on October 13, 2021.

- On November 4, 2021, two Insureds – J.L. and D.P. – were involved in the same motor vehicle accident. Thereafter, J.L. and D.P. sought treatment with Pranevicius Medical P.C. ("Pranevicius Medical") at a No-Fault Clinic located at 1122 Coney Island Ave, Brooklyn, New York. J.L. and D.P. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, Mindaugas Pranevicius M.D. ("Dr. Pranevicius") directed J.L. and D.P.to take the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Naproxen. On November 28, 2021, NY Union dispensed and billed for Lidocaine 5% Ointment and Naproxen pursuant to Fraudulent Prescription Forms purportedly issued by Dr. Pranevicius to J.L. and D.P. on November 16, 2021. Notably, the signatures on the Fraudulent Prescription Forms do not match despite the fact that they were both purportedly issued by Dr. Pranevicius.

133.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

134.    It is extremely improbable that multiple Insureds involved in the same automobile accident who were treated by the same Prescribing Provider would routinely require the same set of pharmaceutical products.

135.    Even so, pursuant to the fraudulent and collusive arrangements, and as demonstrated herein, the Prescribing Providers prescribed, and the Pharmacies dispensed the same set of Fraudulent Pharmaceuticals to Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care.

C.    **The Fraudulent Lidocaine and Diclofenac Prescriptions**

136.    In accordance with the fraudulent scheme discussed above, the Pharmacies routinely billed GEICO for exorbitantly priced topical pain ointments and gels, primarily in the form of Lidocaine 5% Ointment, Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to duplicitous prescriptions solicited from the Prescribing Providers and the Clinic Controllers, in exchange for kickbacks and other financial incentives.

a.    The Fraudulent Topical Lidocaine Ointment and Patches

137.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Lidocaine 5% Ointment because the Defendants could readily buy Lidocaine 5% Ointment but bill GEICO and other New York No-Fault insurers through the Pharmacies for huge sums based on egregiously high wholesale prices.

138.    Lidocaine is a local anesthetic that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

139.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects, including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypertension, and cardiovascular collapse that may lead to

cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

140.     Despite this, the Prescribing Providers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pain which they sustained in fender-bender type motor vehicles accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the excessive prescription of, Lidocaine 5% Ointment and directed those prescriptions to the Pharmacies.

141.     For example, the Prescribing Providers never recommended Insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices around $10.00.

142.     In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

143.     Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

144.     In many instances, and pursuant to the Defendants' fraudulent scheme, Lidocaine 5% Ointment was prescribed at the time of the initial examination during the acute stages of the Insureds' pain symptoms (before Insureds even had an opportunity to first try readily available,

low-cost, OTC Lidocaine products or oral pain medication) and, at times, contemporaneously to

oral NSAIDs, muscle relaxers and/or other Fraudulent Topical Pain Products. For example:

- Insured D.M. was allegedly involved in a motor vehicle accident on August 23, 2022.
  Thereafter, D.M. sought treatment with Atlantic Medical & Diagnostic, P.C. ("Atlantic
  Medical") at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York.
  On August 24, 2022, D.M. underwent an initial examination with Viviane Etienne,
  M.D. ("Dr. Etienne"). On August 28, 2022, Family Rx dispensed and billed for
  Lidocaine 5% Ointment, Cyclobenzaprine, and Baclofen pursuant to prescriptions
  issued by Dr. Etienne on August 24, 2022 – merely one day after the accident.

- Insured S.L. was allegedly involved in a motor vehicle accident on September 12, 2022.
  Thereafter, S.L. sought treatment with Clancy at the Linden Clinic. On September 12,
  2022, on the same date of the purported accident, S.L. underwent an initial examination
  with Clancy. On September 16, 2022, Family Rx dispensed and billed for Lidocaine
  5% Ointment, Cyclobenzaprine, and Naproxen pursuant to a Fraudulent Prescription
  Form purportedly issued by Clancy on September 12, 2022 – the same date of the
  accident.

- Insured D.G. was allegedly involved in a motor vehicle accident on December 22,
  2021. Thereafter, D.G. sought treatment with Tri-Borough NY Medical Practice, PC
  ("Tri-Borough") at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, New
  York. On December 28, 2021, D.G. underwent an initial examination with John Greco,
  M.D. ("Dr. Greco"). On December 29, 2021, Family Rx dispensed and billed for
  Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a Fraudulent Prescription
  Form purportedly issued by Dr. Greco on December 28, 2021 – six days after the
  accident.

- Insured L.S. was allegedly involved in a motor vehicle accident on January 30, 2021.
  Thereafter, L.S. sought treatment with NYC Medical at a No-Fault Clinic located at
  218-14 Hempstead Ave, 2nd Floor, Queens Village, New York. On February 3, 2021,
  L.S. underwent an initial examination with Dr. Jacobi. On February 9, 2021, Quick
  Health dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription
  issued by Dr. Jacobi on February 3, 2021 – four days after the accident.

- Insured S.B. was allegedly involved in a motor vehicle accident on July 21, 2021.
  Thereafter, S.B. sought treatment with Tri-Borough at a No-Fault Clinic located at 105-
  10 Flatlands Ave, Brooklyn, New York. On July 26, 2021, S.B. underwent an initial
  examination with Lee. On July 27, 2021, Quick Health dispensed and billed for
  Lidocaine 5% Ointment, Lidocaine 5% Patches, and Cyclobenzaprine pursuant to
  prescriptions issued by Lee on July 27, 2021 – six days after the accident.

- Insured J.P. was allegedly involved in a motor vehicle accident on March 8, 2022.
  Thereafter, J.P. sought treatment with Macintosh Medical at a No-Fault Clinic located
  at 903 Sheridan Ave, Bronx, New York. On June 1, 2022, J.P. underwent an initial

examination with Mathew. On June 2, 2022, NY Union dispensed and billed for Lidocaine 5% Ointment, Baclofen and Acetaminophen pursuant to a typed paper prescription purposedly issued by Mathew on June 1, 2022. Notably, the prescription submitted in support of NY Union's billing is invalid and illegal in that it is not an electronic prescription or an official serialized New York State prescription nor does it satisfy the requirements of a legitimate fax prescription.

- Insured T.R. was allegedly involved in a motor vehicle accident on April 2, 2022. Thereafter, T.R. sought treatment with Macintosh Medical at a No-Fault Clinic located at 903 Sheridan Ave, Bronx, New York. On June 1, 2022, T.R. underwent an initial examination with Mathew. On June 2, 2022, NY Union dispensed and billed for Lidocaine 5% Ointment, Baclofen and Acetaminophen pursuant to a typed paper prescription purposedly issued by Mathew on June 1, 2022. Notably, the prescription submitted in support of NY Union's billing is invalid and illegal in that it is not an electronic prescription or an official serialized New York State prescription nor does it satisfy the requirements of a legitimate fax prescription.

- Insured S.S.B. was allegedly involved in a motor vehicle accident on May 12, 2022. Thereafter, S.S.B. sought treatment with Macintosh Medical at a No-Fault Clinic located at 903 Sheridan Ave, Bronx, New York. On May 18, 2022, S.S.B. underwent an initial examination with Mathew. On May 19, 2022, NY Union dispensed and billed for Lidocaine 5% Ointment and Acetaminophen pursuant to a typed paper prescription purposedly issued by Mathew on May 18, 2022. Notably, the prescription submitted in support of NY Union's billing is invalid and illegal in that it is not an electronic prescription or an official serialized New York State prescription nor does it satisfy the requirements of a legitimate fax prescription.

145.    Moreover, in accordance with the Defendants' fraudulent scheme, and to maximize profits, the Prescribing Providers often prescribed, and the Pharmacies often dispensed Lidocaine 5% Ointment contemporaneously to other Fraudulent Pharmaceuticals, including oral NSAIDs and/or muscle relaxers. For example:

- Insured A.C. was allegedly involved in a motor vehicle accident on September 27, 2020. Thereafter, A.C. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. On September 28, 2020, A.C. underwent an initial examination with Lim who issued prescriptions for Lidocaine 5% Ointment and Lidocaine 5% Patches. On September 30, 2020, Quick Health dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to prescriptions issued by Lim on September 29, 2020. On November 2, 2020, A.C. underwent a follow-up examination with Lim who again issued prescriptions for Lidocaine 5% Ointment and Lidocaine 5% Patches, as well as Cyclobenzaprine and Naproxen. On November 5, 2020, Quick Health dispensed and billed for Lidocaine 5%

Ointment, Lidocaine 5% Patches, Cyclobenzaprine and Naproxen pursuant to prescriptions issued by Lim on November 4, 2020.

- Insured A.B. was allegedly involved in a motor vehicle accident on December 4, 2020. Thereafter, A.B. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. On December 21, 2020, A.B. underwent an initial examination with Lim who issued prescriptions for Lidocaine 5% Ointment and Lidocaine 5% Patches. On December 24, 2020, Quick Health dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to prescriptions issued by Lim on December 22, 2020.  On February 4, 2021, A.B. underwent a follow-up examination with Dr. Alleyne who issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen. On February 9, 2021, Quick Health dispensed and billed for Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen pursuant to prescriptions issued by Dr. Alleyne on February 9, 2021 – five days *after* the follow-up examination.

- Insured C.R. was allegedly involved in a motor vehicle accident on April 2, 2021. Thereafter, C.R. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. On April 22, 2021, C.R. underwent an initial examination with Dr. Alleyne who issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine, and Naproxen. On April 26, 2021, Quick Health dispensed and billed for Lidocaine 5% Ointment, Cyclobenzaprine and Naproxen pursuant to prescriptions issued by Dr. Alleyne on April 25, 2021 – three days *after* the initial examination.

- Insured T.B. was allegedly involved in a motor vehicle accident on June 26, 2021. Thereafter, T.B. sought treatment with Tri-Borough at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. On July 12, 2021, T.B. underwent an initial examination with Lee who issued prescriptions for Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen. On July 13, 2021, Quick Health dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen pursuant to prescriptions issued by Lee on July 13, 2021.

- Insured S.P. was allegedly involved in a motor vehicle accident on September 16, 2022. Thereafter, S.P. sought treatment with Atlantic Medical at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York. On January 10, 2023, S.P. underwent an initial examination with Wei Hong Xu, NP ("Xu") who issued prescriptions for Lidocaine 5% Ointment, Celebrex, and Tizanidine. On February 8, 2023, Family Rx dispensed and billed for Lidocaine 5% Ointment, Celecoxib (Celebrex), and Tizanidine pursuant to prescriptions issued by Xu on January 10, 2023.

- Insured C.T. was allegedly involved in a motor vehicle accident on July 1, 2022. Thereafter, C.T. sought treatment with Raia MD PC at the Ozone Park Clinic and underwent an initial examination with Dr. Kenworthy on July 12, 2022. On August 23, 2022, C.T. underwent a follow-up examination with Dr. Kenworthy who did not document any prescribed medication in his examination report. Yet, on September 7,

2022, Family Rx dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Kenworthy on August 23, 2022.

- Insured H.B. was allegedly involved in a motor vehicle accident on November 12, 2021. Thereafter, H.B. sought treatment with Pranevicius Medical at a No-Fault Clinic located at 1122 Coney Island Ave, Brooklyn, New York. On November 16, 2021, H.B. underwent an initial examination with Dr. Pranevicius who issued prescriptions for Lidocaine 5% Ointment and Naproxen. On November 28, 2021, nearly *two weeks* later, NY Union dispensed and billed for Lidocaine 5% Ointment and Naproxen pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Pranevicius on November 16, 2021.

- Insured A.A. was allegedly involved in a motor vehicle accident on February 17, 2022. Thereafter, A.A. sought treatment with Tri-Borough at a No-Fault Clinic located at 1767 Southern Blvd, Bronx, New York. On March 1, 2022, A.A. underwent an initial examination with Dr. Greco who issued prescriptions for Lidocaine 5% Ointment and Cyclobenzaprine. On March 2, 2022, NY Union dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a Fraudulent Prescription Form purportedly issued by Dr. Greco on March 1, 2022.

146.    As further part of their scheme, the Defendants, at times, billed for and dispensed exorbitantly-priced Lidocaine 5% Patches and Lidothol 4.5-5% Patches ("Lidothol Patches") (collectively, the "Fraudulent Pain Patches") pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers, in exchange for kickbacks or other incentives.

147.    In further keeping with the fact that the Defendants targeted a specific set of exorbitantly priced Fraudulent Pharmaceuticals, the Defendants dispensed and billed for the Fraudulent Pain Patches despite the availability of less expensive, commercially available FDA-approved patches.

148.    For example, in some instances, the Prescribing Providers prescribed Lidothol Patches, and the Defendants dispensed the same, despite the fact that Lidothol Patches are not FDA approved.

149.    The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality.  Without

FDA review, there is no way to know if a drug is safe and effective for its intended use, whether it is manufactured in a way that ensures consistent drug quality, or whether its label is complete and accurate.

150.    Further, not only are the Lidothol Patches unapproved drug products, but they are also sourced by the Defendants from an unlicensed drug supplier. Pharmacies in New York are prohibited from selling drugs that are sourced from drug suppliers not licensed in New York.

151.    Moreover, Lidocaine 5% Patches are mainly used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves. In fact, while the application of pain patches in which the primary ingredient is Lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

152.    Nevertheless, the Prescribing Providers prescribed these Lidocaine 5% Patches and the unapproved Lidothol Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

153.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers virtually never recommended Insureds first use OTC patches containing lidocaine – which are available to treat their often acute, minor strain/sprain injuries. Rather, the Prescribing Providers prescribed the Fraudulent Pain Patches pursuant to collusive arrangements and predetermined protocols, without regard to genuine patient care.

154.    Family Rx typically billed GEICO between $1,523.08 and $1,904.65 for a single tube of Lidocaine 5% Ointment; and between $280.81 and $616.54 for a prescription of Lidocaine 5% Patches.

155.     Quick Health typically billed GEICO between $1,220.00 and $1,530.00 for a single tube of Lidocaine 5% Ointment; and between $224.70 and $454.40 for a prescription of Lidocaine 5% Patches.

156.     Moreover, NY Union typically billed GEICO between $1,523.08 and $1,904.65 for a single tube of Lidocaine 5% Ointment; and between $2,235.00 and $2,980.00 for a prescription of Lidothol Patches.

157.     To-date, the Defendants have submitted – through the Pharmacies – over $3.1 million in claims seeking reimbursement for Lidocaine 5% Ointment, Lidocaine 5% Patches and Lidothol Patches.

a.     The Fraudulent Topical Diclofenac Gel

158.     In addition to the excessive amounts of Lidocaine 5% Ointment dispensed by the Pharmacies, and to further maximize their profits, the Defendants also solicited the Prescribing Providers and Clinic Controllers to provide them with prescriptions for Diclofenac Gel 3%.

159.     The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

160.     A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

161.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii)

diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

162. Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

163. Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribing Providers and dispensed by the Defendants, is only FDA approved to treat a skin condition known as actinic keratoses.

164. Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel 3% to treat musculoskeletal injuries an accepted off-label use.

165. Notwithstanding the most common and proper uses for Diclofenac Gel 3%, or the risks associated with drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Diclofenac Gel 3%, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs, such as Ibuprofen, Meloxicam, and Naproxen.

166. Prescribing Diclofenac Gel 3%, while simultaneously prescribing or recommending the patient take oral NSAIDS, is therapeutic duplication which results in increased risks with no additional therapeutic benefit.

167. Nevertheless, the Prescribing Providers consciously prescribed and the Defendants consciously dispensed Diclofenac Gel 3% in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being. For example:

- Insured N.J. was allegedly involved in a motor vehicle accident on August 11, 2022. Thereafter, N.J. sought treatment with Raia MD PC at the Woodhaven Clinic. On August 24, 2022, N.J. underwent an initial examination with Yamout who did not document any prescribed medication in the examination report. Yet, on September 7, 2022, Family Rx dispensed and billed for Diclofenac Gel 3% and Meloxicam – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a Fraudulent Prescription Form purportedly issued by Yamout on August 24, 2022. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication and exposed Insured N.J. to increased risks.

- Insured K.E. was allegedly involved in a motor vehicle accident on July 14, 2022. Thereafter, K.E. sought treatment with Raia MD PC at the Woodhaven Clinic. On August 10, 2022, K.E. underwent an initial examination with Yamout who did not document any prescribed medication in the examination report. Yet, on August 16, 2022, Family Rx dispensed and billed for Diclofenac Gel 3% and Meloxicam – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Esomeprazole pursuant to a Fraudulent Prescription Form purportedly issued by Yamout on August 10, 2022. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication and exposed Insured K.E. to increased risks.

- Insured M.E. was allegedly involved in a motor vehicle accident on August 5, 2022. Thereafter, M.E. sought treatment with Atlantic Medical at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York. On August 17, 2022, M.E. underwent an initial examination with Dr. Etienne who issued prescriptions for Diclofenac Gel 3% and Celebrex – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Lidocaine 5% Ointment and Baclofen. On August 25, 2022, Family Rx dispensed and billed for Diclofenac Gel 3%, Celecoxib (Celebrex), Lidocaine 5% Ointment, and Baclofen pursuant to prescriptions issued by Dr. Etienne on August 17, 2022. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Celecoxib constitutes therapeutic duplication and exposed Insured M.E. to increased risks.

- Insured C.C. was allegedly involved in a motor vehicle accident on November 15, 2019. Thereafter, C.C. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York and underwent an initial examination with Dr. Rivera on December 09, 2019. On July 2, 2020, C.C. underwent a follow-up examination with Dr. Alleyne who issued prescriptions for Diclofenac Gel 3% and Naproxen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine and Gabapentin. On July 8, 2020, Quick Health dispensed and billed for Diclofenac Gel 3%, Naproxen, Cyclobenzaprine and Gabapentin pursuant to prescriptions issued by Dr. Alleyne on July 7, 2020 – five days *after* the follow-up examination. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Naproxen constitutes therapeutic duplication and exposed Insured C.C. to increased risks.

- Insured E.M. was allegedly involved in a motor vehicle accident on April 20, 2020. Thereafter, E.M. sought treatment with Metro Pain at a No-Fault Clinic located at 105-10 Flatlands Ave, Brooklyn, New York. On July 13, 2020, E.M. underwent an initial examination with Lim who issued prescriptions for Diclofenac Gel 3% and Ibuprofen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine. On July 14, 2020, Quick Health dispensed and billed for Diclofenac Gel 3%, Ibuprofen, and Cyclobenzaprine pursuant to prescriptions issued by Lim on July 14, 2020. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Ibuprofen constitutes therapeutic duplication and exposed Insured E.M. to increased risks.

- Insured O.W. was allegedly involved in a motor vehicle accident on October 8, 2022. Thereafter, O.W. sought treatment with LR Medical PLLC at a No-Fault Clinic located at 1655 Richmond Ave, Staten Island, New York. On November 10, 2022, O.W. underwent an initial examination with Leonid Litovskiy, P.A. ("Litovskiy") who issued prescriptions for Diclofenac Gel 3% and Meloxicam – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine. On November 16, 2022, NY Union dispensed and billed for Diclofenac Gel 3%, Meloxicam, and Cyclobenzaprine pursuant to prescriptions issued by Litovskiy on November 10, 2022. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication and exposed Insured O.W. to increased risks.

- Insured J.A. was allegedly involved in a motor vehicle accident on May 6, 2022. Thereafter, J.A. sought treatment with Raia MD PC at the Ozone Park Clinic. On May 17, 2022, J.A. underwent an initial examination with Yamout who issued prescriptions for Diclofenac Gel 3% and Meloxicam – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine. On May 18, 2022, NY Union dispensed and billed for Diclofenac Gel 3%, Meloxicam, and Cyclobenzaprine pursuant to a Fraudulent Prescription Form purportedly issued by Yamout on May 17, 2022. Notably, the simultaneous prescription and dispensing of Diclofenac Gel 3% and Meloxicam constitutes therapeutic duplication and exposed Insured J.A. to increased risks.

168.   By engaging in therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of cardiovascular and gastrointestinal events (without any additional therapeutic benefits) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

169.   In further keeping with the fact that the Defendants targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to collusive arrangements

and fraudulent, predetermined and profit-driven treatment protocols, and as demonstrated herein, the Prescribing Providers issued prescriptions to Insureds for Diclofenac Gel 3%, in conjunction with, or contemporaneously to other Fraudulent Topical Pain Products, as well as oral NSAIDs and/or muscle relaxers.

170.    As evidenced by, among other things, the therapeutic duplication and contemporaneous, dispensing of multiple pharmaceuticals, Diclofenac Gel 3% was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

171.    In keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions, and the follow-up examination reports prepared by the Prescribing Providers virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patient experienced any side effects.

172.    The fact that that the Prescribing Providers virtually always failed to properly document the prescriptions for Diclofenac Gel 3% further indicates that there was no legitimate medical reason for the amounts of Diclofenac Gel 3% dispensed by the Defendants, particularly given the potential for adverse health effects to the Insureds.

173.    The Defendants typically billed – through Family Rx– between $2,359.00 and $2,948.75 for a single tube of Diclofenac Gel 3%.

174.     To date, the Defendants have submitted – through Family Rx, Quick Health and NY Union – over $203,000.00 in claims seeking reimbursement for Diclofenac Gel 3%.

**D.     The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribing Providers and Clinic Controllers**

175.     To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacies for large volumes of the specifically targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

176.     New York's statutory framework provides, among other things, that pharmacies and licensed medication professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

177.     Here, the Defendants colluded with each other and the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat hundreds of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to the Pharmacies so that the Defendants could bill GEICO huge sums.

178.     The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in

illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent

Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the

Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health,

care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without

any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals

were prescribed without attention to cost and fiscal responsibility, given that there are FDA-

approved drugs available and appropriate for the particular patients at significantly less cost.

179.    Further, the Defendants and/or Clinic Controllers oftentimes supplied the

Prescribing Providers with Fraudulent Prescription Forms to steer the Prescribing Providers to

prescribe the Fraudulent Pharmaceuticals and direct those prescriptions to Family Rx and NY

Union.

180.    The purpose of the Defendants and/or Clinic Controllers supplying the Prescribing

providers with Fraudulent Prescription Forms was so that the Prescribing Providers could

repeatedly issue predetermined and/or medically unnecessary prescriptions for exorbitantly priced

Fraudulent Pharmaceuticals that the Defendant "specialized" in dispensing in order to exploit the

Insureds' No-Fault Benefits.

181.    The Defendants dispensed and billed for the Fraudulent Pharmaceuticals pursuant

to large volumes of prescriptions purportedly issued by the Prescribing Providers, notwithstanding

that in many instances, there were countless other pharmacies located much closer to the patients'

residences.

182.    The Prescribing Providers and Clinic Controllers supplied the Defendants with

voluminous prescriptions for the Fraudulent Pharmaceuticals.

183.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

184.    The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care, and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

185.    The Prescribing Providers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using Fraudulent Prescription Forms distributed by the Defendants and/or Clinic Controllers, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

186.    But for the payment of kickbacks, or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Pharmaceuticals, or the volume of the Fraudulent Topical Pain Products, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to the Pharmacies.

187.    The Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the amounts paid for the kickbacks because such kickbacks are in violation of New York law.

188.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid, and continue to pay, a financial kickback or provide other financial incentives, and the Prescribing Providers and Clinic Controllers received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that are dispensed by the Pharmacies.

189.    Upon information and belief, the payment of such kickbacks was made at or near the time the prescriptions were issued.

## IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

190.    The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignments of Benefit" ("AOB") forms.

191.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

192.    Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

193.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

194.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

195.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceutical products.

196.    The Defendants intentionally targeted the Fraudulent Topical Pain Products with extremely expensive assigned AWPs or "list prices", in order to inflate the billing submitted through the Pharmacies so as to maximize their profits.

197.    In fact, the Pharmacies never actually paid the targeted and egregious AWP of the Fraudulent Pharmaceuticals that it dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

198.    As a result of their scheme, the Defendants exploited the Pharmacy Fee Schedule and billed GEICO and other No-Fault insurers egregious amounts, which far surpassed the cost of a wide variety of other medications that are FDA-approved and proven effective.

**V.     The Defendants' Submission of Fraudulent NF-3 and HCFA-1500 Forms to GEICO**

199.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault

Benefits have been submitted to GEICO by and on behalf of the Pharmacies seeking payment for

the pharmaceuticals for which the Pharmacies are ineligible to receive payment.

200.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting

records that the Defendants submitted or caused to be submitted to GEICO, are false and

misleading in the following material respects:

i.      The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly
        misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically
        necessary and intended for genuine patient care. In fact, the Fraudulent
        Pharmaceuticals were medically unnecessary and prescribed and dispensed
        pursuant to predetermined fraudulent protocols designed to exploit patients for
        financial gain, without regard for genuine patient care;

ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly
        misrepresented to GEICO that the Defendants were in compliance with all
        material licensing requirements and, therefore, are eligible to receive No-Fault
        Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
        3.16(a)(12). In fact, the Defendants did not comply with all material licensing
        requirements in that the Defendants participated in illegal, collusive
        relationships in which the Defendants steered the Prescribing Providers and
        Clinic Controllers to direct illegal prescriptions for the Fraudulent
        Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and
        other financial incentives;

iii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly
        misrepresented to GEICO that the Defendants were in compliance with all
        material licensing requirements and, therefore, were eligible to receive No-
        Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
        3.16(a)(12).  In fact, the Defendants did not comply with all material licensing
        requirements in that the Defendants intentionally targeted a specific set of
        pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the
        Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in
        place of other effective, less costly pharmaceuticals in order to inflate the
        charges to GEICO;

iv.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly
        misrepresented to GEICO that the Defendants were in compliance with all
        material licensing requirements and, therefore, were eligible to receive No-

Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health and NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health and NY Union in violation of law; and

v.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and/or forged prescriptions.

## VI.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

201.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

202.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

203.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants were involved in collusive and kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies; and (iii) the Pharmacies were not legitimate, separately owned entities but rather used as part of a single, integrated fraudulent scheme.

204.     The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee, and further billed for multiple drug products, including oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

205.     The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

206.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacies have been engaged in fraud.

207.     The Defendants' collection efforts through numerous, separate no-fault collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients across numerous different No-Fault Clinics.

208.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO also ensures that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

209.     The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were

designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $594,500.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $1,783,500.00.

210.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

211.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

212.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $2.4 million in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through the Pharmacies.

213.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacies billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

214.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic

Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives.

215.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

216.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, duplicitous, and/or forged prescriptions.

217.    Quick Health and NY Union have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health and NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health and NY Union in violation of law.

218.    The Defendants, including the Pharmacies, violated New York State regulatory and licensing requirements, rendering the pharmacies ineligible to receive reimbursement for No-Fault Benefits.

219.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through the Pharmacies.

**THE SECOND CLAIM FOR RELIEF**
**Against Kushmakov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221.    Family Rx is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

222.    Kushmakov knowingly conducted and/or participated, directly or indirectly, in the conduct of Family Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Family Rx was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Family Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Family Rx to GEICO that comprise

the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

223.    Family Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kushmakov operated Family Rx, inasmuch as Family Rx never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Family Rx to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Family Rx to the present day.

224.    Family Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Family Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

225.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $202,461.41 pursuant to the fraudulent bills submitted by the Defendants through Family Rx.

226.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against Kushmakov and John Doe Nos. "1" through "5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

227.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

228.    Family Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

229.    Kushmakov and the John Doe Defendants are employed by or associated with the Family Rx enterprise.

230.    Kushmakov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Family Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, that Family Rx was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Family Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, duplicitous,

and/or forged prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

231.     Kushmakov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

232.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $202,461.41 pursuant to the fraudulent bills submitted through Family Rx.

233.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against Family Rx, Kushmakov and John Doe Nos. "1" through "5"**
**(Common Law Fraud)**

234.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

235.     Family Rx, Kushmakov and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Family Rx.

236.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically

necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Family Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Family Rx in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Family Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) in every claim, the representation that Family Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

237.    Family Rx, Kushmakov and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Family Rx that were not compensable under the No-Fault Laws.

238.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $202,461.41 pursuant to the fraudulent bills submitted, or caused to be submitted, by Family Rx, Kushmakov and the John Doe Defendants through Family Rx.

239.    Family Rx, Kushmakov and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

240.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against Family Rx, Kushmakov and John Doe Nos. "1" through "5"
### (Unjust Enrichment)

241.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

242.    As set forth above, Family Rx, Kushmakov and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

243.    When GEICO paid the bills and charges submitted by or on behalf of Family Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Family Rx, Kushmakov and the John Doe Defendants' improper, unlawful, and/or unjust acts.

244.    Family Rx, Kushmakov and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Family Rx, Kushmakov and the John Doe Defendants voluntarily accepted and profited from, as a result of,

among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

245.     Family Rx, Kushmakov and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

246.     By reason of the above, Family Rx, Kushmakov and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $202,461.41.

**THE SIXTH CLAIM FOR RELIEF**
**Against Kushmakov and Borokhov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

247.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

248.     Quick Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. §1961(4), that engages in activities which affect interstate commerce.

249.     Kushmakov and Borokhov knowingly conducted and/or participated, directly or indirectly, in the conduct of Quick Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Quick Health was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Quick Health in

exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Quick Health to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

250.    Quick Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kushmakov and Borokhov operated Quick Health, inasmuch as Quick Health never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Quick Health to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Quick Health to the present day.

251.    Quick Health is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially

enrich the Defendants.  These inherently unlawful acts are taken by Quick Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

252.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $272,129.57 pursuant to the fraudulent bills submitted by the Defendants through Quick Health.

253.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE SEVENTH CLAIM FOR RELIEF**
**Against Kushmakov, Borokhov and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

254.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

255.   Quick Health is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

256.   Kushmakov, Borokhov and the John Doe Defendants are employed by or associated with the Quick Health enterprise.

257.   Kushmakov, Borokhov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Quick Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, that Quick Health was not eligible to receive under the New York no-fault insurance

laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Quick Health in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous and/or forged prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

258.    Kushmakov, Borokhov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

259.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $272,129.57 pursuant to the fraudulent bills submitted through Quick Health.

260.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE EIGHTH CLAIM FOR RELIEF
### Against Quick Health, Kushmakov, Borokhov and John Doe Nos. "1" through "5"
### (Common Law Fraud)

261.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

262.   Quick Health, Kushmakov, Borokhov and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Quick Health.

263.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Quick Health acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Quick Health in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Quick Health acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-

3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) in every claim, the representation that Quick Health acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health in violation of law; and (v) in every claim, the representation that Quick Health acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

264.    Quick Health, Kushmakov, Borokhov, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Quick Health that were not compensable under the No-Fault Laws.

265.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $272,129.57 pursuant to the fraudulent bills submitted, or caused to be submitted, by Quick Health, Kushmakov, Borokhov and the John Doe Defendants through Quick Health.

266.    Quick Health, Kushmakov, Borokhov and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

267.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE NINTH CLAIM FOR RELIEF
### Against Quick Health, Kushmakov, Borokhov and John Doe Nos. "1" through "5"
### (Unjust Enrichment)

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

269.    As set forth above, Quick Health, Kushmakov, Borokhov and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

270.    When GEICO paid the bills and charges submitted by or on behalf of Quick Health for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Quick Health, Kushmakov, Borokhov and the John Doe Defendants' improper, unlawful, and/or unjust acts.

271.    Quick Health, Kushmakov, Borokhov and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Quick Health, Kushmakov, Borokhov and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

272.     Quick Health, Kushmakov, Borokhov and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

273.     By reason of the above, Quick Health, Kushmakov, Borokhov and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $272,129.57.

**THE TENTH CLAIM FOR RELIEF**
**Against Kushmakov and Niazov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

274.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

275.     NY Union is an ongoing "enterprise", as that term is defined in 18 U.S.C. §1961(4), that engages in activities which affect interstate commerce.

276.     Kushmakov and Niazov knowingly conducted and/or participated, directly or indirectly, in the conduct of NY Union's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost two years, seeking payments that NY Union was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NY Union in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that

they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of NY Union in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through NY Union to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

277.   NY Union's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kushmakov and Niazov operated NY Union, inasmuch as NY Union never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for NY Union to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NY Union to the present day.

278.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $120,007.43 pursuant to the fraudulent bills submitted by the Defendants through NY Union.

279.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE ELEVENTH CLAIM FOR RELIEF**
**Against Kushmakov, Niazov and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

280.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

281.     NY Union is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

282.     Kushmakov, Niazov and the John Doe Defendants are employed by or associated with the NY Union enterprise.

283.     Kushmakov, Niazov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of NY Union's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for almost two years, that NY Union was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NY Union in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration,

licensing, and application documents filed on behalf of NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of NY Union in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous and/or forged prescriptions.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

284.    Kushmakov, Niazov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

285.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,007.43 pursuant to the fraudulent bills submitted through

286.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THE TWELFTH CLAIM FOR RELIEF
**NY Union, Kushmakov, Niazov and John Doe Nos. "1" through "5"**
**(Common Law Fraud)**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

288.    NY Union, Kushmakov, Niazov and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of NY Union.

289.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that NY Union acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to NY Union in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that NY Union acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) in every claim, the representation that NY Union acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants made false statements on registration, licensing, and application documents filed on behalf of NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of NY Union in violation of law; and (v) in every claim, the representation that NY Union acted in accordance with material licensing requirements

and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

290.    NY Union, Kushmakov, Niazov and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NY Union that were not compensable under the No-Fault Laws.

291.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $120,007.43 pursuant to the fraudulent bills submitted, or caused to be submitted, by NY Union, Kushmakov, Niazov and the John Doe Defendants through NY Union.

292.    NY Union, Kushmakov, Niazov and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

293.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE THIRTEENTH CLAIM FOR RELIEF
### Against NY Union, Kushmakov, Niazov and John Doe Nos. "1" through "5"
### (Unjust Enrichment)

294.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

295.    As set forth above, NY Union, Kushmakov, Niazov and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

296.    When GEICO paid the bills and charges submitted by or on behalf of NY Union for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on NY Union, Kushmakov, Niazov and the John Doe Defendants' improper, unlawful, and/or unjust acts.

297.    NY Union, Kushmakov, Niazov and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that NY Union, Kushmakov, Niazov and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

298.    NY Union, Kushmakov, Niazov and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

299.    By reason of the above, NY Union, Kushmakov, Niazov and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $120,007.43.

### THE FOURTEENTH CLAIM FOR RELIEF
**Against Kushmakov, Borokhov, and Niazov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

300.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

301.    Family Rx, Quick Health and NY Union constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

302.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Family Rx, Quick Health, and NY Union are ostensibly independent entities – with different names and tax identification numbers – that were created and used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

303.    The Pharmacy Enterprise operates under three separate names and tax identification numbers in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one entity.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

304.    The Pharmacy Enterprise is distinct from, and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating various professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO), by preparing and filing fraudulent applications and documents in order to obtain licenses and registrations necessary to operate as pharmacies in New York State, by recruiting and supervising personnel, by creating and maintaining patient files and other records, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, by selecting and purchasing the

targeted Fraudulent Pharmaceuticals from wholesalers, by coordinating the fraudulent scheme with various Prescribing Providers and Clinic Controllers operating at multiple No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent Pharmaceuticals to them to dispense to Insureds, by facilitating payments stemming from the illegal kickback arrangements, and by retaining collection lawyers whose services were also used to generate payments from insurance companies to support all of the aforesaid functions.

305.    Kushmakov, Borokhov, and Niazov were employed by and/or associated with the Pharmacy Enterprise.

306.    Kushmakov, Borokhov, and Niazov knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Pharmacy Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration, licensing, and

76

application documents filed on behalf of Quick Health and NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health and NY Union in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions.

307.    The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges.  The predicate acts of mail fraud are the regular way in which Kushmakov, Borokhov, and Niazov operate the Pharmacy Enterprise and acts of mail fraud therefore are essential for the Pharmacy Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, continuous changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Pharmacies to the present day.

308.    The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" – "3".  Each such mailing was made in furtherance of the mail fraud scheme.

309.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

310.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $594,598.41 pursuant to the fraudulent bills submitted by Kushmakov, Borokhov, Niazov and the John Doe Defendants through the Pharmacy Enterprise.

311.    By reason of their injuries, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE FIFTEENTH CLAIM FOR RELIEF
### Against Kushmakov, Borokhov, Niazov and John Doe Nos. "1" through "5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

312.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

313.    Kushmakov, Borokhov, Niazov and the John Doe Defendants are employed by and/or associated with the Pharmacy Enterprise.

314.    Kushmakov, Borokhov, Niazov and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Pharmacy Enterprise was not eligible to receive because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful

kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of Quick Health and NY Union with the NYS Pharmacy Board in order to illegally conceal the identities of all of the true owners and controllers of Quick Health  and NY Union in violation of law; and (v) the billed-for services were the product of illegal, invalid, duplicitous, and/or forged prescriptions.

315.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "3".  Each such mailing was made in furtherance of the mail fraud scheme.

316.    Kushmakov, Borokhov, Niazov and John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

317.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $594,598.41 pursuant to the fraudulent bills submitted through the Pharmacy Enterprise.

318.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO

Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

      A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Pharmacies have no right to receive payment for any pending bills, amounting to approximately $2.4 million submitted to GEICO;

      B.      On the Second Claim For Relief against Kushmakov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $202,461.41, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      C.      On the Third Claim For Relief against Kushmakov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $202,461.41, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      D.      On the Fourth Claim for Relief against Family Rx, Kushmakov, and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $202,461.41, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      E.      On the Fifth Claim for Relief against Family Rx, Kushmakov and John Doe Nos. "1" through "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $202,461.41 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Claim For Relief against Kushmakov and Borokhov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $272,129.57, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Claim For Relief against Kushmakov, Borokhov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $272,129.57, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Claim for Relief against Quick Health, Kushmakov, Borokhov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $272,129.57, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Claim for Relief against Quick Health, Kushmakov, Borokhov and John Doe Nos. "1" through "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $272,129.57 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Claim for Relief against Kushmakov and Niazov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $120,007.43, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Claim for Relief against Kushmakov, Niazov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial

but approximately $120,007.43, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Claim for Relief against NY Union, Kushmakov, Niazov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $120,007.43, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Claim for Relief against NY Union, Kushmakov, Niazov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $120,007.43, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Claim for Relief against Kushmakov, Borokhov, and Niazov compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $594,598.41, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

O.      On the Fifteenth Claim for Relief against Kushmakov, Borokhov, Niazov and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $594,598.41, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:  Uniondale, New York
        September 29, 2023

RIVKIN RADLER LLP

By: s/ Michael A Sirignano
        Michael A. Sirignano
        Barry I. Levy
        Jennifer Abreu
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*